UNITED STATES of America, Plaintiff,

v.

Carolyn Ann SAFFOLD, a/k/a Carolyn Walker, Defendant.

No. 95–10012–03.

United States District Court,
D. Kansas.

Jan. 11, 1996.

D. Blair Watson, Office of United States Attorney, Wichita, KS, for plaintiff.

Gail A. Jensen, Wichita, KS, Marc T. Little, Los Angeles, CA, for defendant.

## MEMORANDUM AND ORDER

WESLEY E. BROWN, Senior District Judge.

This matter is before the court on defendant Carolyn Saffold's motions for judgment of acquittal and for new trial. (Docs. 126, 127). Ms. Saffold was convicted by a jury of

three counts: conspiring with co-defendant Bobbert Cook to kill Richard Jimerson, a Kansas Highway Patrol Trooper, with the intent to prevent Jimerson's testimony in an official proceeding, in violation of 18 U.S.C. § 371; attempting to kill Jimerson with the intent to prevent his testimony, in violation of 18 U.S.C. § 1512(a)(1)(A); and unlawfully using a facility in interstate commerce with the intent to commit a crime of violence, in violation of 18 U.S.C. § 1952(a)(2). The government has filed its response to the defendant's motions.

Defendants Saffold and Cook were tried jointly. The government's evidence at trial, highly summarized, showed that on February 6, 1995, Kansas Highway Patrol Trooper Richard Jimerson stopped a van for speeding on Interstate 70 near Wakeeney, Kansas. Inside the van were Brian Walker, who was defendant Carolyn Saffold's boyfriend, and Mr. Walker's half-brother, Bobbert Cook. In a subsequent search of the vehicle, Trooper Jimerson found approximately 38 kilos of cocaine in cardboard boxes in the back of the van. Cook and Walker were arrested and charged with possession of cocaine with intent to distribute.

Acting on an informant's tip that Cook had threatened Trooper Jimerson's life, the DEA sent an undercover agent to the jail where Cook was being held. The agent, posing as a friend of the informant's and representing himself to be Daniel Ortega, a Vietnam veteran and sometimes hitman now working in the repossession business, offered to help Cook with his problem. In subsequent recorded conversations, Cook hired "Ortega" to kill Jimerson, telling him that "I just need to get rid of this Jimerson before court so he won't be a witness ..." and "I want him dead." Cook agreed to pay the agent $3,000 to kill Jimerson, including an advance payment of $1,000 to be sent via money order to the agent at a Wichita hotel. In the course of this conversation, Cook told the agent that "only me and you and [the informant] knows about this" and that Brian Walker knew only that Cook "had something going to take care of evidence."

On the same day this arrangement was made, Cook telephoned Carolyn Saffold in California. The next day, Saffold asked a friend of hers named Sandra DeLoatch to send two five hundred dollar money orders to Daniel Ortega in Wichita. Saffold provided DeLoatch $1,000 cash and the agent's fictitious name and address. DeLoatch purchased and sent the money orders as requested. DeLoatch used a fictitious name herself when shipping the money orders. When later questioned by DEA agents about the incident, DeLoatch initially denied having sent the money orders, but subsequently admitted it. She told the agents she understood the money would help "quash the case" against Brian Walker. At trial, DeLoatch again admitted sending the money orders at Saffold's request but said she and Saffold hadn't discussed who the recipient was, except that Saffold told her the money was for someone who might help Brian Walker get home. DeLoatch testified that she used a fictitious name for the transaction because she did not know the recipient of the money. She also testified that Saffold had been extremely distraught over her boyfriend Walker's incarceration.

The government also presented testimony at trial from a DEA task force agent who had interviewed defendant Saffold in the course of the investigation. When first interviewed, Saffold said she didn't recognize the fictitious names used by DeLoatch or the undercover agent. She said she had asked DeLoatch to send the money orders to Brian Walker's wife in Sacramento to help out with a vehicle problem, and that if the orders had been mailed to Wichita then DeLoatch must have done that. The following day, Saffold spoke to the agent again and told him she had lied the day before. She admitted asking DeLoatch to send the money orders to the Wichita address. Saffold told the agent she believed the money was for the purpose of protecting Brian Walker's tractor from being repossessed.

The defendant Bobbert Cook took the witness stand in his own defense. He admitted making the arrangement with the undercover agent, but argued that he had been entrapped. He testified that he had asked Carolyn Saffold to send the money orders

but told her nothing about the plan to murder the trooper.

I. *Motion for Judgment of Acquittal* (Doc. 127). Defendant Saffold moves for judgment of acquittal, arguing the evidence failed to show that she knew the money orders were for the illegal purpose of paying a hitman to kill Trooper Jimerson. She thus contends that the jury engaged in speculation in finding her guilty. This speculation is demonstrated, she argues, by the jury's question during deliberations as to whether on the conspiracy charge it had to be shown that Carolyn Saffold knew the money was for a murder.

■ The court must order the entry of a judgment of acquittal on a defendant's motion if the evidence is insufficient to sustain a conviction. Fed.R.Crim.P. 29(a). The standard for determining sufficiency of the evidence is whether any rational factfinder could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In making this determination, the court must view the evidence and all reasonable inferences therefrom in the light most favorable to the prosecution. *Id.* This standard recognizes that it is the responsibility of the jury to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.*

■ The court concludes that a jury could reasonably infer from the facts presented that Carolyn Saffold knew the money was for the purpose of paying someone to kill Trooper Jimerson and that she willingly joined in this plan. The timing of events and the circumstances under which the money orders were sent suggest that Saffold had such knowledge. Saffold was distraught over her boyfriend's incarceration. She kept in close contact with Walker and Cook while they were in jail, as was shown by telephone records from the jail. Immediately after Cook hired Ortega to kill the trooper, he called Saffold and had her send the money orders to Ortega. Instead of sending the money herself, however, Saffold asked DeLoatch, a friend of some twenty years, to do it. Saffold provided $1,000 cash for the purchase of the money orders. Although DeLoatch claimed she didn't know the illicit purpose of the money, she used a fictitious name when sending it, which suggests awareness that the payments had an improper purpose. *Cf. United States v. Johnson,* 57 F.3d 968, 972 (10th Cir.1995) (Defendant's knowledge inferred from her use of a false name on a package containing drugs.) Of course, whatever knowledge DeLoatch had came from Saffold. Additionally, both Saffold and DeLoatch lied to investigators when they were questioned about the money orders. Saffold initially denied having directed DeLoatch to send the money to Ortega in Wichita. This evidence is clearly sufficient to permit a jury to infer that Saffold knew the payments had an illicit purpose. Somewhat more difficult, perhaps, is identifying any particular evidence that implies Saffold knew the specific illicit purpose for the payment—i.e, that it was to procure the Trooper's murder. Taken as a whole, however, the evidence would permit a jury to reasonably infer such knowledge. In addition to the evidence described above, Saffold's relationship with Brian Walker and Bobbert Cook, her distress over Walker's imprisonment, and the frequent phone calls between Cook or Walker and Saffold all tend to suggest that she was informed of the specific purpose of the payments. Additionally, statements attributable (directly or indirectly) to Saffold such as the money would "quash the case" and was for someone who would help Brian Walker get to come home support an inference that she knew the specific purpose of the payments. The court concludes that the evidence was sufficient to support the convictions.

II. *Motion for New Trial* (Doc. 126). Defendant moves for a new trial on the grounds that two errors were committed in the course of trial: first, she argues, the jury was not allowed to hear the testimony of the informant read back, despite a request for such testimony; and second, a question submitted by the jury during deliberations shows that they misunderstood the court's instructions on conspiracy.

 Upon motion by a defendant, the court may grant a new trial "if required in the interest of justice." Fed.R.Crim.P. 33. The defendant has the burden of proving the necessity of a new trial. *United States v. Jackson,* 876 F.Supp. 1188, 1194 (D.Kan. 1994). A new trial should be granted upon any error of sufficient magnitude to require reversal on appeal. *Id.* (citing 3 Charles A. Wright, Federal Practice and Procedure: Criminal 2d § 556 (1982)).

 The defendant has not demonstrated that error was committed here. As to the request from the jury to have testimony read back, the court informed the jury they could have that testimony if it was necessary to their deliberations. Clearly, the jury was able to reach a verdict without a read back of the testimony. As to the jury's question about whether it had to be shown that Carolyn Saffold knew the money was for a murder, the court cannot agree that this somehow undermines the jury's verdict. The question might be interpreted as showing that the jury was properly focusing upon the central issue in the case. In response to the question, the court referred the jury to the conspiracy instruction, which stated that in order to find Ms. Saffold guilty the jury had to find that she and Bobbert Cook made an agreement to kill Richard Jimerson and that she knew the unlawful purpose of the agreement and joined in it wilfully. To the best of the court's recollection (without a transcript), the defendant made no contemporaneous objection to the court's handling of either of these two jury requests. Under the circumstances, the court sees no basis for concluding that error was committed.

III. *Conclusion.* Defendant Saffold's motion for judgment of acquittal (Doc. 127) and motion for new trial (Doc. 126) are hereby DENIED. IT IS SO ORDERED.